IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 14-00134-01-CR-W-GAF |
| ) | |
| STEVEN M. MILES, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Miles' Motion to Suppress Evidence Seized During Unlawful Inventory Search and Defendant's Statement as Fruit of the Poisonous Tree (doc #21). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On May 5, 2014, a Criminal Complaint was filed against Steven M. Miles. On May 20, 2014, the Grand Jury returned a one count indictment against defendant Miles. The indictment charges that on May 5, 2014, defendant Miles, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm.

On September 18, 2014, an evidentiary hearing was held on defendant's motion to suppress. Defendant Miles was represented by Assistant Federal Public Defender Carie Allen. The Government was represented by Assistant United States Attorney Brent Venneman. The Government called Officer Luke Balsley of the Kansas City, Missouri Police Department as a witness. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On May 5, 2014, Officer Luke Balsley and his partner, Officer Taylor Hall, were working the night shift. (Tr. at 4) At approximately 1:00 a.m., Officers Balsley and Hall were conducting a routine patrol in the area of 72nd and Bellefontaine when they observed a silver Lincoln driving with two other vehicles in the area. (Tr. at 6) The Lincoln had an out-of-state license plate which caught the officers' attention. (Tr. at 6) The officers ran the plates through the computer. (Tr. at 6) It took a period of time to receive a response on the plates and during that time, the officers lost contact with the vehicle. (Tr. at 6) When the response came back, it showed that the plates did not belong to the Lincoln. (Tr. at 6) The officers then began an area canvass for the Lincoln. (Tr. at 6)

2. The officers caught up with the Lincoln on Bellefontaine between 72nd and 73rd Streets. (Tr. at 7) Officer Balsley testified that as the officers rounded the corner from 73rd Street onto Bellefontaine, the Lincoln turned its lights off and was then operating in the dark on the city street. (Tr. at 7) As the officers attempted to catch up to the vehicle to conduct a traffic stop, the Lincoln pulled into a driveway at 7211 Bellefontaine. (Tr. at 7) The officers pulled in behind the Lincoln. (Tr. at 7) The officers had activated the overhead lights on their marked police vehicle. (Tr. at 7)

3. Officers Balsley and Hall exited their patrol vehicle. (Tr. at 8) Officer Hall, who was driving the patrol vehicle, approached the driver of the Lincoln. (Tr. at 8) Officer Balsley approached the passenger side of the Lincoln. (Tr. at 9) Officer Balsley did not hear the initial conversation that Officer Hall was having with the driver of the Lincoln, but he eventually circled around to the driver's side where he could hear a little better. (Tr. at 9) Officer Hall had requested identification for the driver and registration for the vehicle. (Tr. at 9) The driver, Sierra Oldenburg, had produced a driver's license, but no proof of ownership or insurance for the Lincoln.[1] (Tr. at 9) The officers were told that 7211 Bellefontaine was the address for Ms. Oldenburg, but Officer Balsley testified that he did not believe that they had been provided with any information to verify that it was her address.[2]

---

[1] On cross-examination, Officer Balsley testified that Ms. Oldenburg did provide some proof of insurance, but the officers were not able to verify that the insurance went with the Lincoln. (Tr. at 31-32)

[2] On cross-examination, Officer Balsley agreed that 7211 Bellefontaine was the residence of defendant Miles and his girlfriend, Ms. Oldenburg. (Tr. at 29) However, on re-direct, Officer Balsley testified that at 1:52 a.m., the time when Balsley was alerted to the marijuana cigarette in the vehicle, the officers had not been able to confirm that 7211 Bellefontaine was the residence of defendant Miles and Ms. Oldenburg through any sort of documentation. (Tr. at 50, 52) Officer

(Tr. at 13)

4. Officer Balsley testified that the windows of the Lincoln appeared to have some kind of a temporary tinting on them which almost completely blacked out the side windows so that the officers did not have a clear view into the vehicle. (Tr. at 10) Officer Balsley testified that the tint on this vehicle was in violation of a City of Kansas City, Missouri ordinance. (Tr. at 11)

5. There were two passengers in the Lincoln, Steven Miles in the front and Rodney Campbell in the back. (Tr. at 9-10) Officer Balsley testified that the occupants of the vehicle had lit cigarettes which were filling the vehicle with the odor of smoke. (Tr. at 10-11) The officers ran records checks on the driver and two passengers. (Tr. at 10) The records check on Steven Miles came back with two Kansas City warrants. (Tr. at 11) The occupants of the vehicle were asked to exit the vehicle and Miles was placed in handcuffs. (Tr. at 11)

6. The information the officers had on the Lincoln was that the plates did not belong to the vehicle and the plates also did not respond to anyone in the vehicle. (Tr. at 12) The plates were registered to another party. (Tr. at 12) Ms. Oldenburg and defendant Miles told the officers that they had recently purchased the vehicle and had not yet registered it under their names. (Tr. at 12) Officer Balsley testified that during his initial encounter with defendant Miles and Ms. Oldenburg on May 5, 2014, he was not given or shown the bills of sale for the vehicle which were admitted as Defendant's Exhibits 1 and 2. (Tr. at 12)

7. After the occupants of the Lincoln were asked to exit the vehicle, the officers asked for consent to search the Lincoln. (Tr. at 12-13) Officer Balsley testified that he wanted to search the vehicle to see if there was contraband in it. (Tr. at 14) Based on the time of day the vehicle was out in a high-crime area known for drugs, the tinting of the windows, and the fact that there were numerous cigarettes lit when the officers contacted the occupants in the vehicle in what Officer Balsley believed was an attempt to mask other odors that may be present in the vehicle, such as the odor of marijuana, Officer Balsley believed there was contraband in the vehicle. (Tr. at 14-15) Consent was not given. (Tr. at 13)

8. The officers then determined that the vehicle would be towed. (Tr. at 13) Officer Balsley testified that the officers decided the vehicle would be towed because it could not be legally driven on city streets. (Tr. at 14) The officers had observed the vehicle being driven on city streets without proper registration and without insurance. (Tr. at 14) Officer Balsley testified that he has vehicles towed "all the time" when there is no proof of insurance. (Tr. at 53) Officer Balsley testified

---

Balsley testified that the officers ran Ms. Oldenburg through the computer and were able to see that she had a valid driver's license, but the address did not come back as 7211 Bellefontaine. (Tr. at 55)

that while the officers' desire to search the vehicle was part of the reason they decided to tow the vehicle,[3] it was not their sole reason. (Tr. at 14) Officer Balsley testified that officers tow vehicles regularly that are not legal to be driven for safety and other reasons. (Tr. at 14) Officer Balsley testified that he believed he was following the department's tow policy on May 5, 2014. (Tr. at 15-16) The tow policy provides in part: "B. In the officer's discretion, vehicles may be towed when: … 14. The condition of the vehicle, while being operated, is in violation of city ordinance or state law."[4] (Government's Ex. 3 at A-2)

9. The officers notified defendant Miles and Ms. Oldenburg that the Lincoln would be towed. (Tr. at 16) Officer Balsley testified that Miles and Oldenburg were definitely unhappy with the officers' decision. (Tr. at 16) Other persons had gathered in the area at this point. (Tr. at 16) Officer Balsley testified that when the officers made their initial contact with the occupants of the Lincoln, no one else was there. (Tr. at 17) However, several cars pulled in on the street behind the patrol vehicle and parties exited and attempted to interact with the officers while they were conducting the traffic stop. (Tr. at 17) The parties were questioning the officers as to what they were doing and just generally being disruptive. (Tr. at 17) The officers ordered the parties to stay back and told them that the officers needed to conduct their investigation, but the parties kept taking the officers' attention away from the stop. (Tr. at 17) Eventually, the parties returned to their vehicles and left. (Tr. at 17) A short time later, a group of people walked through the yard and gathered on the porch of the residence at 7211 Bellefontaine. (Tr. at 17) At some point, the officers had to threaten the use of pepper spray. (Tr. at 17) Backup officers were requested and responded to the scene. (Tr. at 18-19)

10. The officers ordered a wagon to transport defendant Miles because he was under arrest on the outstanding warrants. (Tr. at 18) Miles became combative with the officer who was escorting him down the driveway to the wagon. (Tr. at 18) Miles was placed on the ground. (Tr. at 18) Ms. Oldenburg refused to stay back from the officer who was dealing with Miles and had to be placed in handcuffs to restrain her. (Tr. at 18) Oldenburg was ticketed for the traffic violations and placed under arrest for hindering the officers' investigation. (Tr. at 19)

11. Officer Johnson, one of the officers who had responded to the scene as backup, contacted Officer Balsley and told Balsley that he wanted him to come and take a look at something Johnson had seen in plain view from outside the Lincoln. (Tr. at

---

[3] The Kansas City, Missouri Police Department tow policy contains provisions for an inventory of the contents of a vehicle when it is to be towed. (Tr. at 13)

[4] Another paragraph of the tow policy provides: "B. In the officer's discretion, vehicles may be towed when: … 13. Any vehicle is parked on the streets or any public place and bears a city license plate or decal … which has been issued to a motor vehicle other than that to which it is affixed …." (Government's Ex. 3 at A-2) Officer Balsley testified that this section did not permit the towing of the vehicle because the vehicle was parked on private property. (Tr. at 33)

19-20) Officer Johnson directed Officer Balsley's attention to the front passenger's side window. (Tr. at 20) The window was rolled down a couple inches giving the officers a slight view of the interior. (Tr. at 20) Officer Balsley testified that as he looked in the window, he was able to see what appeared to be a marijuana cigarette on the passenger's seat, the seat where defendant Miles had been sitting when he was asked to exit the vehicle. (Tr. at 20) No officer had yet entered the vehicle or searched it. (Tr. at 28)

12. It was determined that the scene was now under control and that the officers would begin their search of the vehicle. (Tr. at 21) The vehicle was locked. (Tr. at 21) The officers requested keys to the vehicle, but were denied. (Tr. at 21) The officers were able to reach through the open window and unlock the vehicle.[5] (Tr. at 21)

13. The marijuana cigarette was recovered. (Tr. at 21) A .45 caliber handgun was recovered from the glove box of the vehicle. (Tr. at 22)

### III. DISCUSSION

Defendant Miles seeks to "suppress all evidence found during an unconstitutional inventory search of Mr. Miles' car and Mr. Miles' statement to the police, which came on the heels

---

[5]The Incident Report written by Officer Balsley did not mention the fact that Balsley had seen the marijuana cigarette prior to opening the door of the Lincoln. The Report stated:

> I then attempted conduct an inventory prior to tow of the listed vehicle, however, [Ms. Oldenburg] had locked doors when she exited and refused to surrender the keys. I then observed an open window on the front passenger's side door. I reached through the window, unlocked the door, and gained entry into the vehicle. At this time, I observed a rolled cigarette containing a green leafy substance sitting on the front passenger's seat of the vehicle.

(Defendant's Ex. 4 at 1-2) On cross-examination, Officer Balsley confirmed that he saw the marijuana cigarette prior to the search. (Tr. at 46) (While defense counsel asked Officer Balsley if he saw the gun in plain view prior to the inventory search, the Court assumes that counsel misspoke and was asking about the marijuana cigarette.) (Tr. at 46-47) Officer Balsley believed the discrepancy in the Incident Report was based on the fact that he initially intended to search the vehicle pursuant to an inventory search and that he was tired as he wrote the report as by that time (approximately 2:00 p.m.) he was on a significant amount of overtime. (Tr. at 39, 51) The video of the car stop confirms the order of events to which Officer Balsley testified, that is that Officer Johnson directed Officer Balsley's attention to the front passenger's window and that Officer Balsley then reached through the open window, unlocked the door and recovered the marijuana cigarette. (Government's Ex. 1 at 1:52-1:53)

of the unlawful search." (Motion to Suppress (doc #21) at 1) The government responds that the search was lawful based upon plain view and the automobile exception to the warrant requirement. (Government's Response at 3) In addition, the government argues that the search was valid pursuant to the Kansas City, Missouri Police Department tow policy. (Id. at 6)

### A. The Initial Stop and Arrest

The initial stop of defendant Miles' vehicle was lawful. As the Eighth Circuit Court of Appeals has observed, "a traffic violation--however minor--creates probable cause to stop the driver of the vehicle." United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007); United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002), cert. denied, 538 U.S. 992 (2003); United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000). Prior to the stop, the officers had run the plates on the Lincoln through the computer and had been advised that the plates did not belong to the Lincoln. (See Fact No. 1, supra) The traffic violation provided probable cause to stop the vehicle.

The officers ran records checks on the driver and two passengers. (See Fact No. 5, supra) The records check on Seven Miles, the front seat passenger, came back with two Kansas City warrants. (Id.) Defendant Miles was placed under arrest on the outstanding warrants. The Court finds that the officers had probable cause to place defendant Miles under arrest.

### B. Warrantless Search

In Arizona v. Gant, 556 U.S. 332 (2009), the United States Supreme Court provided the following basic guidance when analyzing a warrantless search:

> Consistent with our precedent, our analysis begins, as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnote omitted).

Gant, 556 U.S. at 338. One of the established exceptions to the warrant requirement that the Court listed was the "automobile exception." The Court stated:

> Other established exceptions to the warrant requirement authorize a vehicle search under additional circumstances when safety or evidentiary concerns demand. ... If there is probable cause to believe a vehicle contains evidence of criminal activity, United States v. Ross, 456 U.S. 798, 820-21 (1982), authorizes a search of any area of the vehicle in which the evidence might be found. ... Ross allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader.

Gant, 556 U.S. at 346-47. "Probable cause exists 'where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Cortez-Palomino, 438 F.3d 910, 913 (8th Cir. 2006)(quoting United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005)).

In the instant case, the officers observed, through a window,[6] a marijuana cigarette in plain view on the front passenger's seat, the seat where defendant Miles had been sitting when he was asked to exit the vehicle. (See Fact No. 11, supra) It is settled law that an officer may seize an object in plain view without a warrant provided the officer is lawfully in the position from which he views the object, the object's incriminating character is immediately apparent and the officer has a lawful right to access the object. See United States v. Khabeer, 410 F.3d 477, 482 (8th Cir. 2005). See also Payton v. New York, 445 U.S. 573, 587 (1980)("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.") The seizure of the marijuana cigarette was proper under the "plain view" doctrine.

Based on the discovery of the "plain view" marijuana cigarette, combined with the time

---

[6] Looking through a car's window is not considered a search for Fourth Amendment purposes. See United States v. Brown, 653 F.3d 656, 661 (8th Cir. 2011), cert. denied, 132 S.Ct. 1649 (2012).

of day the vehicle was out in a high-crime area known for drugs, the tinting of the windows, and the fact that there were numerous cigarettes lit when the officers contacted the occupants in the vehicle in what Officer Balsley believed was an attempt to mask other odors that may be present in the vehicle, such as the odor of marijuana (see Fact No. 7, supra), the Court finds the officers had probable cause to search the vehicle for additional marijuana under the automobile exception. See United States v. Rosas, 2011 WL 7046028, *10 (D. Minn. Nov. 23, 2011)(officer's discovery of marijuana in plain sight in car provided sufficient probable cause for full search of car and its compartments based on automobile exception); United States v. Drake, 2009 WL 1158675, *6 (E.D. Mo. Apr. 28, 2009)(observation of marijuana in plain view gave officer probable cause to search areas of vehicle where further marijuana or other drugs could be hidden). See also United States v. Rowland, 341 F.3d 774, 784-85 (8th Cir. 2003)(discovery of drug paraphernalia during Terry search supported warrantless search of remainder of vehicle under automobile exception); United States v. Fladten, 230 F.3d 1083, 1086 (8th Cir. 2000)(automobile exception allowed officers to search trunk of automobile where item commonly used in manufacture of methamphetamine was in plain view in back seat of automobile giving officers probable cause to believe that further contraband may be found in other parts of automobile). The officers recovered a .45 caliber handgun from inside the glove box. (See Fact No. 13, supra) Because drugs could have been hidden in the glove box, the search of the glove box was proper and the firearm was legally seized. See Rowland, 341 F3.d at 785; Drake, 2009 WL 1158675 at *6-7.

Given the Court's finding that the search was proper pursuant to the automobile exception to the warrant requirement, the Court need not address the government's second justification for the search, i.e. that the search was proper pursuant to the Kansas City, Missouri

Police Department tow policy as an inventory search.

C. Statement

Defendant argues that he was interrogated approximately six hours after the illegal search and after being confronted about the weapon, made a statement which must be suppressed as fruit of the poisonous tree. (Motion to Suppress Evidence (doc #21) at 5) As there was no constitutional violation in the search of the Lincoln or the discovery of the weapon, defendant's argument that his statement must be suppressed as fruit of the poisonous tree must be denied.

IV. CONCLUSION

Given the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Miles' Motion to Suppress Evidence Seized During Unlawful Inventory Search and Defendant's Statement as Fruit of the Poisonous Tree (doc #21).

Counsel are reminded they have fourteen days after being served a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

/s/ *Sarah W. Hays*
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE